HOYLE & ABBOTT *v.* SOUTHERN SAW WORKS.

1. The court committed no error in ruling out the following testimony of one of the plaintiffs: "The material was bought under a misunderstanding of its real value, caused by the misrepresentation of one of the officers of the Southern Saw Works," it not appearing from the testimony of the witness what the misrepresentation was, or how it induced him to buy the property for more than its value.

2. Where one offers to buy of another a particular article of certain quality, and the seller fraudulently ships to him a different article or one of inferior quality; and where the buyer has no opportunity of examining the property purchased until after its delivery, he has a right to rescind the contract, if the offer to do so is made within a reasonable time after the discovery of the fraud practiced upon him.

3. The mere fact that the buyer attempted, after a delivery of the goods, to sell the same, will not necessarily deprive him of the right to rescind.

4. As a general rule, inadequacy of price alone will not be sufficient to set aside a contract; yet that circumstance, taken in connection with others of a suspicious nature, may afford such a vehement presumption of fraud as would authorize the court to set it aside.

5. There was sufficient evidence in this case of the facts alleged in the original petition to require submission of the same to a jury, and the court erred in granting a nonsuit.

Argued May 18, 19, 1897.—Decided July 23, 1898.

Complaint for damages. Before Judge Lumpkin. Fulton superior court. September term, 1897.

*Abbott, Cox & Abbott,* for plaintiffs.
*Alexander & Lambdin,* for defendant.

COBB, J. Hoyle & Abbott brought suit against the Southern Saw Works, alleging that on or about January 29, 1896, the defendant sold to the plaintiffs twenty-one barrels of saw scrap steel weighing 19,350 lbs. for $581.77, being three cents per lb., and the plaintiffs have paid defendant for the same. They were induced to pay this price, which was grossly excessive, by the false representations made by an officer and agent of the defendant, that the market price of such steel was four cents per lb. and that such steel had been sold by the defendant at that price. These misrepresentations were made to mislead the plaintiffs, who were inexperienced in the business, which fact was known to the defendant, and by means of such misrepresentations they

were misled and induced to buy the steel and pay this exorbitant price for it, its true value not being more than fifty or sixty dollars.   It was put up in barrels and could not be thoroughly examined without great and unusual labor, but there was enough of the steel put at the top of some of the barrels to cause the whole to have the appearance of being of the quality that was bought; but the entire lot was not such as was contracted for.   The contract was for the purchase of pure and unmixed saw scrap steel.   The lot delivered was mixed scrap and had other material, such as cast iron, and the like, mixed with it, thereby making it objectionable and undesirable.   They have been unable to find any person who would make an offer on the steel as it was delivered to them.   Upon discovering the fraud which had been perpetrated upon them, the property was promptly tendered back and a demand made upon the defendant for the return of the money, which was refused.   Plaintiffs "make a continuing tender" of the steel, and, waiving discovery, pray that the defendant be decreed to take the steel and pay plaintiffs the amount paid by them with interest, and that the contract be rescinded.   Upon the trial it appeared that Hoyle, one of the plaintiffs, had a conversation with Boyd, who represented the defendant, in which conversation a car of saw scrap steel was offered for sale.   Subsequent negotiations were carried on by correspondence.   On January 18, 1896, plaintiffs wrote to defendant, asking for lowest cash price on the car of scrap steel which was referred to in the conversation between Boyd and Hoyle.   On January 22, the defendant replied, stating that sales heretofore of scrap steel had been made by bids from parties wanting it, but that they would price the plaintiffs " rates f. o. b. East Point, three cents per lb.," stating further that this was in barrels, which was considered quite an advantage over loose scrap steel, and that they thought this price very reasonable.   On January 24, the plaintiffs wrote to the defendant, quoting the offer made in the letter of January 22, and accepting the same, and asking that the defendant have the cars billed to Atlanta, and stating that upon receipt of the bill for the material they would remit check.   On January 25, the defendant wrote to the plaintiffs that as early as possible the next week

they would have the car of steel loaded and forwarded to Atlanta as directed. It appeared from the evidence, that Boyd had told Hoyle, one of the plaintiffs, that the saw scrap steel that he had to sell was superior material, and that similar information was given him over the telephone by two other persons representing the defendant, who informed him that the saw scrap steel offered was saw scrap steel and gummings. The cash market price of the saw scrap steel delivered in Atlanta on the date of the purchase was ten to twelve dollars per ton of 2,000 lbs., and of scrap gummings nineteen dollars. The price paid by the plaintiffs was forty dollars per ton in excess of the market value. At the time of payment the attention of the agent of the defendant was called to the fact that the price was in excess of what plaintiffs intended to pay, and the agent stated that the saw scrap steel was worth it and that he had sold such at 3¾ cents per lb. The officers and agents of the defendant with whom the plaintiffs dealt had a thorough knowledge of the value of the article which was the subject-matter of the contract, and the plaintiffs had had no experience in the purchase and sale of the same. The material bought was worth only five to six dollars per ton. Plaintiffs made strenuous efforts to sell it and to get the market quotations on it, writing letters and telegrams to various parties, all of which appear in the record. The material was packed in twenty-one barrels and accepted by plaintiffs as saw scrap steel at the time of the purchase, without examination, which would have caused great labor and expense, to have examined it piece by piece. Many of the barrels were packed at the top with saw scrap gummings, and after the purchase an examination was made, when it was found that it was not what it was represented to be. Offers to rescind the purchase were made, one of the plaintiffs stating to Boyd the causes that led them to buy the material. On March 3, plaintiffs wrote to defendant a letter referring to the several conversations which had been had relative to the steel and stating that they were unable to dispose of the same except at a heavy pecuniary loss, and therefore asked that as a compromise the defendants accept the steel and one hundred dollars and refund to the plaintiffs $481.77. All

the propositions to rescind were declined.   A thorough examin-
ation of the material showed it to be ordinary scrap iron and
steel very much mixed, consisting of saw scrap gummings, saw
scrap steel of various kinds, scrap iron, such as pots, hoop iron,
hammers, castings, and the like, the market price of which
would be four or five dollars per long ton.   The efforts to obtain
quotations on the steel and sell the same continued until March
16.   The suit was filed on August 18, 1896.   At the conclusion
of the plaintiffs' evidence the court, upon motion of the defend-
ant, granted a nonsuit, and to this ruling the plaintiffs excepted.

1. Hoyle, one of the plaintiffs, was examined by interrogato-
ries.   Among other questions propounded to him was the fol-
lowing:   "If the price paid said defendants was in excess of
the market price on said date, state how much in excess, and
state how it occurred that the plaintiffs paid three cents per lb.
for the same."   The answer was:   "About forty dollars per
ton.   The material was bought under misunderstanding of its
real value, caused by misrepresentations of the officers of the
Southern Saw Works."   The last sentence of the answer was
objected to, on the ground that it did not state facts, but stated
mere conclusions of the witness.   The court sustained the ob-
jection and excluded the testimony, and to this ruling the plain-
tiffs excepted.   It not appearing from the testimony of the wit-
ness what the misrepresentations were, or how they induced him
to buy the property at a price in excess of its actual value, there
was no error in excluding the evidence.

2. The contract between the parties was closed by the letter
from the plaintiffs to the defendant, dated January 14, 1896,
above referred to.   It does not distinctly appear in the record
when the material was received by the plaintiffs, but it must have
been some time subsequent to the 25th of January, 1896, as
on that day the defendant wrote to the plaintiffs advising them
that shipment would be made as early as possible in the follow-
ing week.   After the material was received by the plaintiffs, re-
lying upon the representations of the defendant in regard to its
quality, and upon the presumption that it would ship them ex-
actly what had been ordered, they did not examine the material,
but delayed such examination for a few days, as they had a right

to do.    Upon an examination being subsequently made, when it clearly appeared that the articles shipped were essentially different from the articles which had been ordered, the plaintiffs, according to the testimony of one of them, made two distinct propositions offering to return the property shipped to them and rescind the contract, which were declined, and on March 3, 1896, subsequently to the verbal propositions of rescission, wrote to the defendant, offering as a compromise that the defendant take back the steel and refund to the plaintiffs the amount of the purchase-money, less one hundred dollars.    If the delay of the plaintiffs in examining the articles sold was not unreasonable, and if the offer to rescind was promptly made upon the discovery of the fraud which had been perpetrated upon them, the fact that there had been delay in making the examination would not destroy the plaintiffs' right to rescind.    It appearing that the material must have been received by the plaintiffs some time about the 1st of February, and the letter offering the compromise being dated March 3, it would have been proper to have submitted to the jury the question as to whether, under these facts, the delay in making the examination was for an unreasonable length of time, and whether the offer to rescind was promptly made upon the discovery of the fraud which the plaintiffs claimed had been perpetrated upon them.

3.  But it is contended by the defendant, that the plaintiffs had waived their right to rescission, because they attempted, after the delivery of the goods to them, to sell the same.    It appears from the evidence that the attempt to sell the articles began shortly after the delivery of the goods, and was continued pending the propositions for rescission and continued after all the propositions for rescission had been declined.    That the buyer of personal property is dealing with the same as his own, and in such a way only as an owner would deal with it, might be sufficient for the jury to find that there had been waiver of the right to rescission, growing out of a fraud perpetrated by the seller at the time of the purchase.    The mere fact, however, that the buyer attempts to sell the article and does not effect a sale will not alone constitute a waiver of the right to rescind the contract upon the ground of fraud.    An offer of the article for sale

under the circumstances is subject to explanation by the buyer, and where, as in the present case, the buyer, as soon as informed of the fraud which had been perpetrated upon him, notified the seller that the articles delivered were not of the character ordered, and subsequently offered to rescind, and pending such offer made attempts to obtain market quotations as to the price of the article, looking to a sale of the same, these attempts continuing after the offer to rescind had been finally declined, but the articles or no part of the same being actually sold, a jury should have been called upon to determine whether, under the facts and circumstances related, there had been a waiver by the plaintiffs of their right to take advantage of the fraud which had been perpetrated upon them and rescind the contract.

4. According to the undisputed evidence in this case, an article which was worth six dollars per ton was sold to the plaintiffs at the rate of sixty dollars per ton. Inadequacy of consideration ordinarily will not be sufficient to set aside a contract; but gross inadequacy of consideration is a circumstance indicative of fraud, and that, together with other circumstances, may be sufficient as a ground for rescission. Bisph. Eq. (5th ed.) § 219. Our code declares that, " inadequacy of price is no ground for rescission of a contract of sale, unless it is so gross as combined with other circumstances to amount to a fraud." Civil Code, § 3549. In the case of *Wormack* v. *Rogers,* 9 *Ga.* 60, it was held, that "inadequacy of price, as a general proposition, will not, per se, be a sufficient ground to set aside a conveyance in a court of equity; yet that circumstance, taken in connection with others of a suspicious nature, may afford such a vehement presumption of fraud as will authorize the court to set it aside." And in the opinion Judge Warner uses this language: " Inadequacy of consideration, as a general proposition, is not, per se, a sufficient ground to set aside this conveyance, although, as was remarked by Lord Thurlow, in Gwynne v. Heaton (1 Brown's Ch. Rep. 9), the inadequacy of price paid, compared to the value of the property purchased, 'is so gross and manifest, that it must be impossible to state it to a man of common sense, without producing an exclamation at the inequality of it.' While we do not place our judgment *exclusively*

upon the ground of the *inadequacy* of the consideration, yet, *that circumstance,* taken in connection with the *other facts* charged in the bill, furnishes the most vehement presumption of *fraud."*

5. Viewing the record as a whole, we have reached the conclusion that the case should have been submitted to the jury, and that the nonsuit was improper. There was evidence from which the jury could have found that the price agreed to be paid was grossly excessive; that the defendant was thoroughly conversant with all matters relating to the subject-matter of the contract; that the plaintiffs, if not entirely ignorant of the same, were not as thoroughly versed as to the matter which was the subject of the contract as was the defendant; that the article shipped was essentially different from the article ordered; that within thirty days after the articles were received they were examined and found not to correspond with the articles called for by the terms of the contract of sale; that two distinct offers of rescission were made; that attempts had been made before and after and pending the offers of rescission to sell the article, but that no sale had been made. Under this state of facts, it seems to us that the jury should have been allowed to pass upon the questions as to whether a fraud had been perpetrated; whether the plaintiffs had exercised diligence in discovering it; whether they had promptly offered to rescind the contract and return the article upon this discovery; and whether by their offers to obtain quotations on the article and attempts to make a sale of the same they had waived their right to rescind.

*Judgment reversed. All the Justices concurring.*